## Petry et al. *v.* Harwood Electric Co., Appellant (No. 1).

*Corporations — Preferred stock — Merger—Dissolution—Amor-
tizement of under valued securities—Costs.*

1. Where a contract between a corporation and its preferred
stockholders provides for preference dividends, and that, on disso-

PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1). 143

1924.] Syllabus—Statement of Facts.

lution, the preferred stock without voting power shall be first paid at its par value, in preference to the common stock, out of the assets of the company, and the common stockholders bring about a merger with other corporations, the merger works a dissolution, and the preferred stockholders are entitled to full payment for their shares out of the assets of the company, and not payment at market value. Reproduction costs are admissible in finding value.

2. From the circumstance that stock in the new company was given to common stockholders of the old in exchange for their shares, the conclusion could be drawn that the assets of the merging company were sufficient to pay the preferred stockholders par for their shares; otherwise the common stockholders would have been entitled to nothing on the merger.

3. Where the common stockholders, through the control of the company, do not pay dividends on the preferred stock, but divert the earnings of the company to the amortization of the difference between the book values and the supposed real values of securities acquired by the company at the time it was organized, and the result is greatly to lessen the market value of the preferred stock, the preferred stockholders, on the merger of the company with other corporations, are entitled to be paid out of assets, the full par value of their stock.

4. In such case, the attempt to amortize the value of securities owned, which, if the account remains unchanged, in no way depletes the capital, by retaining net earnings, is a breach of the contract with the preferred stockholders.

5. If the preferred stockholders are compelled to resort to litigation to establish their rights, the costs thereof should be imposed upon the corporation.

6. The Merger Act of May 3, 1909, P. L. 408, does not apply here.
*Equity—Practice, equity—Chancellor's findings of fact.*

7. The rule that the findings of a chancellor approved by the court below are entitled to the same weight as the verdict of a jury, is especially applicable where such findings are the result of an investigation of the business affairs of a manufacturing corporation.

Argued January 18, 1924. Appeal, No. 218, Jan. T., 1924, by defendant, from decree of C. P. No. 5, Phila. Co., March T., 1920, No. 6397, for plaintiff on bill in equity, in case of Frederick J. Petry et al. v. Harwood Electric Co. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

144 PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1).

Statement of Facts—Arguments.        [280 Pa.

Bill for injunction to prevent merger or to compel payment of value of preferred stock as on dissolution. Before MARTIN, P. J.

The opinion of the Supreme Court states the facts.

Decree for plaintiff. Defendant appealed.

*Error assigned* was, inter alia, decree, quoting it.

*George Wharton Pepper,* with him *Wm. Jay Turner,* for appellant.—There was a merger and not a dissolution within the meaning of the stock certificates: Lauman v. R. R., 30 Pa. 42; Hale v. R. R., 161 Mass. 443; Riddell v. Harmony Fire Co., 8 Phila. 310.

There was no evidence to justify valuation of $100 per share: Lauman v. R. R., 30 Pa. 42.

The only measure of valuation recognized by law is market value as distinguished from actual value or, differently expressed, "actual value limited and defined by market value": Philadelphia & Reading C. & I. Co. v. Northumberland Co. Com'rs, 229 Pa. 460, 466.

*Owen J. Roberts,* with him *Robert C. Walker,* for appellees.—The nature and extent of the preferences to which the holders of the preferred stock of defendant are entitled are to be ascertained from the language of the stock certificates which constitute the contract between the corporation and its stockholders: Sterling v. Watson Co., 241 Pa. 105; Warren v. Queen & Co., 240 Pa. 154; McLean v. Plate Glass Co., 159 Pa. 112; Colgate v. Leather Co., 73 N. J. Eq. 72.

The merger of defendant with various other companies into the Pennsylvania Power & Light Company was in fact and in law a dissolution of defendant within the meaning of its preferred stock certificates: Lauman v. R. R., 30 Pa. 42; Barnett v. Market Co., 218 Pa. 649; Hale v. R. R., 161 Mass. 443; Dalmas v. R. R., 254 Pa. 9.

PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1). 145

1924.]                    Opinion of the Court.

OPINION BY MR. JUSTICE SCHAFFER, March 24, 1924:

This is a proceeding in equity by certain of the preferred stockholders of defendant company to enjoin its merger with other companies, or, failing that, to obtain the value of their stock. The court refused to enjoin the merger but determined that plaintiffs should be paid the par value of their shares. From the decree entered defendant appeals. In a separate action it was adjudged that plaintiffs were also entitled to payment of accumulated dividends. We dispose of that case in another opinion.

As appellant's counsel say, the whole issue involved is the valuation of the shares of preferred stock owned by stockholders who dissented from the merger. To decide this issue, it is necessary to first determine the effect of the merger, so far as the preferred stockholders are concerned. Their position is that as to them it worked a dissolution of the company, and that they are to be paid as they would have been in event of a dissolution, whereas defendant argues that the merger did not work a dissolution, and that the preferred stockholders are to be paid the market value of their shares as provided by the Merger Act of May 3, 1909, P. L. 408, 5 Purdon 5702. It was shown that the market value of the preferred stock had greatly depreciated at the time of the merger, by reason of the failure to pay dividends on it for a number of years. Plaintiffs claim this resulted from the design of those who controlled the common stock, and was accomplished by the diversion of funds properly applicable to preferred dividends, with the purpose in mind, while this course of action was being carried through, of effecting the merger, and with the ultimate object of acquiring the preferred stock at a figure very much less than its actual worth.

Appellees contend defendant company was possessed of net assets sufficient to pay the par value of their stock, $100 per share, and the accrued dividends thereon; while, on the other hand, defendant asserts that plain-

146 PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1).

Opinion of the Court. [280 Pa.

tiffs are entitled only to the market value, which is in the neighborhood of $20 per share, or, assuming that the position of appellees is correct, that the consolidation was in effect a dissolution, then the value is to be fixed on the basis of a proportionate distribution of net assets, and the amount to be awarded should be fixed at $26.40 per share, as a result of figures deduced from appellant's testimony as to value. The preferred stock was without voting power, and the certificates contained this provision: "The holders of the preferred stock shall be entitled to receive cumulative dividends at the rate of six per cent per annum, which must be declared by the board of directors, when earned, to the extent of, and only from the undivided net earnings of the Harwood Electric Company remaining after the payment of all operating expenses and fixed charges in each and every fiscal year, and which shall be in preference and priority to any payment in and for such fiscal year of any dividend on other stock. *In case of the dissolution of the company, the preferred stock shall be first paid and redeemed at its par value, in preference to the common stock, out of the property or assets of the company."* We held in Pardee v. The Harwood Electric Co., 262 Pa. 68, that this stipulation was a contract between defendant and the holders of its preferred stock. It should be noted that this proceeding is not under the merger act, but to enforce the contract.

Did the merger work a dissolution of the company so far as the preferred stockholders are concerned? That, in the domain of the practical, a dissolution resulted from the merger there can be no doubt; after it was accomplished the defendant's existence ended, so far as being a going, operating entity is concerned; its property and good will passed into the control and ownership of the new corporation and it ceased to do business. The effect was to wipe out the merging companies and fuse them all into the new one created.

PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1). 147

1924.]                    Opinion of the Court.

It is argued by appellant that a dissolution did not take place, because what resulted has none of the attributes of a dissolution, as there was no liquidation and winding up of the company, no sale, no fund raised, no payment of indebtedness and no surplus for distribution among stockholders, that even the separate existence of the company was not terminated, since the merger statute provides that the constituent companies may be deemed "to be in existence" to preserve the rights of creditors and liens upon the property. It is also argued that what was said in Lauman v. Lebanon Valley R. R. Co., 30 Pa. 42 (relied on by the court below), does not justify the conclusion that a merger works a dissolution, as the real point of that decision is, as indicated by the order made, that an injunction restraining the merger "be dissolved on the defendants giving security to the plaintiff in double the market value of his stock to pay for said stock when its value shall be ascertained." It is contended that had the theory of a dissolution been applied to that controversy, the court, instead of providing for security to cover market value, would have directed the ascertainment of the plaintiff's distributive share in the net assets of the corporation. That case involved the merging of the Lebanon Valley Railroad Company into the Philadelphia & Reading Railroad Company, and the right to make the merger was challenged by a stockholder of the Lebanon Company. We think what was there determined establishes the principle that the effect of a merger, as to non-assenting stockholders, is a dissolution of the corporation. Chief Justice LOWRIE said (p. 45) : "By such an act the Lebanon Company loses its actual identity, abandons its name and therefore its legal identity and its corporate existence, and can no longer claim any legal recognition. This is called a merger of the Lebanon corporation into the other; but such a merger is a dissolution, destroying the actual identity of both, while the legal identity of one of them is preserved, as where a life estate is merged in

148 PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1).

Opinion of the Court.                    [280 Pa.

a fee simple, one being destroyed and the other enlarged by the operation......[p. 46]. Any stockholder may treat such a matter as equivalent to a dissolution, at least as regards him, and for such a case the law provides a means of securing to him his share of the property, or its value......[p. 48]. The contract of consolidation is an act of dissolution in form and substance of the Lebanon Company,......[p. 49]. The act of dissolution works a change in the form of the interests of its members, by destroying the stock, and substituting the thing which the stock represented; that is, a legal interest in the property, and leads the members to such a division of this." While the order there entered directed security to be given in double the market value of his stock, the stockholder's right to recover was not limited to market value; the injunction restraining the merger was to be dissolved on the defendants giving security to "pay for said stock *when its value shall be ascertained.*" Double the market value was used merely as a measuring rod for determining the amount of security, not the value of the stock.

It would be a very unjust rule, which would limit a non-assenting shareholder's right of recovery to market value, where value, as measured by assets, was much the greater. To state the extreme case, if preferred stock had no market value, although on dissolution it was manifest it had an actual value, could that actual value be disregarded and it receive nothing? So far as appellees are concerned, the result of the merger should be the same as if the assets of the corporation had been sold for cash and not for securities of the merged company. In Barnett v. Phila. Market Co., 218 Pa. 649, while what was discussed was the market value of the shares which did not assent to the merger, it was nowhere said that market value was the only value to be fixed for them. Speaking of the act which in that case authorized the merger (Act of May 29, 1901, P. L. 349), this language was used (p. 654): "It authorizes consolidation but does

PETRY v. HARWOOD ELECTRIC CO., Appel. (No. 1). 149

1924.]                    Opinion of the Court.

not take away the right of a stockholder to refuse to surrender his stock for that in a new corporation or to take anything less for it than its actual value, if his company is to be practically dissolved." It was further said: "We have not been persuaded that any error was committed by the referee in fixing the par value of the stock at its market value, ...... The value was ascertained in accordance with our own cases and the authorities generally directing how the value of stock of this kind, not listed and having no quoted price, shall be determined." It is indisputable that no dividends could be paid on the preference shares after the merger, and that the assets of the company, so far as those shares are concerned, have passed beyond their or their company's control. Our conclusion is the court below was correct in determining that the merger worked a dissolution as to the preferred stockholders.

It is our judgment that the appellees are entitled to receive the real, actual value of their shares, and that market value does not measure this real, actual value. To indicate why it does not and why appellant's figures as to actual value cannot be accepted, and the reason for our assent to the fixing of the par value of the stock, determined by the court below as the figure plaintiffs are entitled to receive, a recounting of some of the corporate history of the defendant company is necessary. It was organized in 1912 as the result of a merger. Its capital stock was fixed at $3,688,000, divided into 6,880 shares of preferred and 30,000 shares of common stock. The par value of each share was $100, and it was put out as full paid and nonassessable. Nearly all of the plaintiffs purchased their stock at par and accrued dividends. On organization, the company received securities belonging to others of the merged companies of the par value of $1,070,635. These were entered on defendant's books at a valuation of $3,998,884.34, which was almost $3,000,000 more than they were worth. This book value was given them in order that the issue of $688,000 preferred stock

150 PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1).

Opinion of the Court.                    [280 Pa.

and $3,000,000 common stock as full paid and non-assessable might appear to be justified. Dividends were paid on the preferred stock from the date when the company was organized until March, 1914. Since that time none has been paid. The subject of the payment of dividends on the preferred stock was before us in Pardee v. The Harwood Electric Co., 262 Pa. 68, and it was there determined that the preferred stockholders had no right, under the circumstances shown, to insist on their payment. The policy of those in control of defendant, following that decision in 1917, would seem to have been to divert the earnings of defendant and of certain of its constituent companies, notably a coal company and a store company, from the payment of dividends, in order to substitute actual value for the $3,000,000 over-valuation of the securities owned, and it is the contention of appellees that the purpose back of the refusal to pay dividends on the preferred stock was to put value into the common stock, to enhance it at the expense of their shares and thus to lessen their value. It is admitted, that, throughout all the period during which there was a diversion of earnings to the amortization of the over-valuation of securities owned, the merger was in contemplation by those who controlled the defendant company. Following the year 1917, defendant's net operating revenues greatly increased. In 1918, they amounted to $405,733 and in 1919 to $487,701, excluding depreciation. In addition, it had for these two years a non-operating income of $111,077 and $134,791 respectively. Taking the depreciation charges at the amounts the defendant itself set up and omitting the earnings of certain of the subsidiary companies, the net earnings of the defendant for 1918 were $68,000; for 1919, $156,118; and for the first five months of 1920, $165,247, or at the rate of $396,592 for that year, which would have paid 6% on the preferred stock and more than 11% on the common.

PETRY v. HARWOOD ELECTRIC CO., Appel. (No. 1). 151

1924.]                        Opinion of the Court.

The chancellor determined that the net assets of the defendant immediately preceding the merger were ample to pay par on the preferred stock. He did not, however, specifically find the net value of the assets, and complaint is made of this by appellant, who claims the record does not show figures warranting the conclusion that the assets were sufficient to discharge the preferred stock at par. Our review of the record convinces us there was testimony authorizing the finding which the chancellor made. Wise, the general manager of defendant, in the spring of 1920, shortly before the merger, caused an itemized inventory to be made of all defendant's property. He took the labor and material costs for the years 1917, 1918 and 1919, and, averaging them, computed what it would cost to replace the defendant's property. His estimate was $6,803,000. He testified this represented the bare physical value and that the figures were considerably less than the 1920 reproduction costs. There was no allowance made for going-concern value, and, in addition, there were other items which should have been taken into account which would have increased the estimated worth to more than $7,000,000. The statement made by defendant's general manager, fully conversant with the property, was prepared in connection with the application to the Public Service Commission for approval of the merger. While defendant contends, because of the use to be made of it, this is not a reliable estimate of the value, our conclusion is just the opposite. It was prepared by an officer of the company to be placed before a public body, upon the faith of which it was to act, and, therefore, the reliability and trustworthiness of the estimate was of a high order.

Silliman, defendant's witness, on the question of values, said he had made no valuations as they are generally made, by an inventory of the property and the pricing of it, but admitted that, in arriving at conclusions, a correct appraisement and balance sheet would be a necessary thing. It is not set up anywhere in the

evidence that the balance sheet resulting from the figures of Wise is not correct. Taking the sum arrived at by him and allowing for reasonable depreciation of the property, which in our opinion would have been largely, if not entirely, offset by the going-concern value of the enterprise and the other items which were not taken into the computation, and deducting the debts of all kinds, aggregating $4,779,125, it is apparent there were net assets remaining of over $2,000,000. The total issue of preferred stock was $688,000. There can be no question as to the net assets being adequate to pay the preferred stockholders par and accrued dividends. Our review of the record satisfies us that the net value of the capital assets as shown by plaintiffs was low rather than high. The chancellor thus summed up the defendant's testimony on the question of value: "The witnesses, called by defendant to testify to the value of shares of preferred stock, regarded the proceeding as similar to a petition under the [merger] statute and entirely ignored the terms of the stock certificate fixing the value at par; and placed their low appraisal of its value upon the effect produced on the preferred stock by the affairs of the corporation being managed to destroy the earning power of the stock for an indefinite period, which they assumed to be legitimate." This finding and the others made by the chancellor are entitled to great weight, considering the kind of case we are dealing with. "The rule that the findings of a chancellor approved by the court below are entitled to the same weight as the verdict of a jury is especially applicable where such findings are the result of an investigation of the business affairs of a manufacturing corporation": Pardee v. The Harwood Electric Co., 262 Pa. 68, 74; Childs v. Adams, 43 Pa. Superior Ct. 239.

There are other factors which should be taken account of in concluding that there were ample assets to pay the par value of the preferred stock. Those who were bringing about the merger believed that it had substantial worth, even though no dividends were paid, as is shown

PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1). 153

1924.]                    Opinion of the Court.

by the fact that the Lehigh Power Securities Corpora-
tion, which owned a large majority of the common stock,
just before the merger offered to purchase all the pre-
ferred stock at $86.25 per share. Defendant's witnesses
based their judgment of the worth of the preferred stock
on what it would bring in the market, no dividends hav-
ing been paid on it for years, and the policy of the con-
trollers of the common stock being not to pay any
dividends on it, at as low as $20 per share, with a range
between that and $35 per share. That Silliman, defend-
ant's principal witness, relied entirely on the lack of
dividends on the stock to fix its value and not on the
company's assets, is shown by this extract from his testi-
mony: "I don't attach the first importance to the value
of the physical property, because I think it makes no
difference. If the property was worth ten times that
much, and it did not have any earnings, the stock would
not have any value." In the companion proceeding to
this, the court determined there was diverted from divi-
dends on the preferred stock the sum of $227,000, appro-
priated for the purpose of amortizing the value of
securities owned. This sum was set aside during the
years 1917, 1918 and 1919. If the sums set aside in each
of these years had been appropriated, as they might have
been, to the payment of dividends on the preferred stock,
then the basis for the estimate of defendant's witnesses
would not exist, as the stock would have been receiving
dividends, not only those that were accruing, but those
which had accumulated; for this reason the court would
have been justified in finding that the shares were worth
par, as their market value undoubtedly would have been
had there been the proper application of earnings. We
agree with the chancellor's statement: "The attempt to
amortize the value of 'securities owned', which if the ac-
count remains unchanged will in no way deplete the
capital, by retaining net earnings, is a breach of the con-
tract with the preferred stockholders. The sum of $227,-
000 appropriated for that purpose should be applied to

154 PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1).

Opinion of the Court. [280 Pa.

dividends on preferred stock.......If the sum of $227,-000 set aside during 1917, 1918 and 1919 had been added to the net earnings of $11,350 appearing upon the books of defendant, the fund, amounting to $238,350, would be sufficient to declare dividends of $34.64 upon each share of the preferred stock." The accumulated dividends amounted to $38 per share. It is a significant circumstance that the policy of amortizing the over-valuation of securities owned has been discontinued since the merger.

The sums credited to the amortization of the over-valuation of securities owned from the earnings of the defendant were as follows: 1917, $13,000; 1918, $64,-000; 1919, $150,000. The finding of the court below as to these charges was as follows: "The net profits realized from the Harwood Electric Company and companies owned by it, after retaining sufficient sums to provide for depreciation and amortization in accordance with the policy pursued by the directors prior to 1917, would have been ample to enable the directors to declare dividends upon the preferred stock in accordance with the terms of the certificates of stock; but the profits were retained and charged to amortization of the difference between the book value and the supposed real value of the properties and assets acquired by the company at the time it was organized.". The court also found: "At the trial it appeared that the stock was issued as full paid; that preferred stockholders had no right to vote; that the directors elected by the holders of the common stock after setting aside adequate sums for amortization, depletion, depreciation, obsolescence and sinking fund reserve, introduced a system of applying the profits earned in the conduct of the business to the credit of an account carried on the books as 'Securities owned' which represented properties of which defendant had become owner, and had taken at the valuation of $3,998,884.34. Although the stock was subscribed and paid for in reliance upon this valuation, and issued as full paid, an attempt

PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1). 155

1924.]                    Opinion of the Court.

was made to reappraise the securities, to show a decrease
in value of $3,000,000 and apply the earnings of defend-
ant to the amortization of this 'Securities owned'
account, thereby defeating the right of preferred stock-
holders to the dividends stipulated in their certificates
and enhancing the value of the shares of common stock.
In the findings of fact, conclusions of law and decree,
credit was allowed for amortization in all instances in
which the capital of the corporation was depleted or im-
paired; but defendant was not permitted to apply earn-
ings which preferred stockholders were entitled under
the terms of their certificates to receive, to increase the
capital assets of the corporation by juggling the figures
of the 'Securities owned' account and arbitrarily re-
ducing the appraised value of the securities and employ-
ing operating profits to restore the balance.    Trial
balances indicating the prosperous conduct of the busi-
ness carried on by the defendant and showing the great
value of its assets, which had been exhibited and used
when it was to the advantage of the company to appear
prosperous, were repudiated, and the figures of the books
and accounts skillfully manipulated in an effort to prove
that the company would be insolvent if required to liqui-
date its indebtedness."

We think the court below gave too great weight to our
decision in the Pardee Case, and that it would have been
warranted in reaching the conclusion that in addition to
the sums which had been diverted from the payment of
dividends in order to substitute actual value for the over-
valuation of assets owned, undue sums had been diverted
and charged to depreciation of property and plant.   The
Pardee decision only dealt with money set aside for the
latter purpose.   There was no issue in that case involv-
ing the excess valuation of securities owned.

There is a further reason so far as dividends are con-
cerned why the merger should not have been permitted
to go through unless the preferred stock was given its
contract rights.   For the first five months of 1920, just

156 PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1).

Opinion of the Court. [280 Pa.

prior to the merger, the company showed large earnings. These were properly appropriable to the preferred stock. In a just determination of the rights of these stockholders, the company could not be permitted to merge with these large earnings and its prospective earnings without paying the dividends on the preferred stock.

Still another potent reason exists to justify the decree of the court below. A merger could not be made and par and cumulative dividends on the preferred stock not be paid under the contract with the preferred stockholders, unless all the net corporate assets were first applied to the payment of their shares and accrued dividends. If there were not sufficient assets to pay the preferred stockholders par and accrued dividends, then, as against the common stockholders, the preferred ones were entitled in the merger to get all of the stock distributable to the defendant company, and the common stockholders would not be entitled to receive any of it. As a matter of fact, the common stockholders received for their stock in the defendant company large holdings of stock in the merged company. They could not justly and equitably deny to the preferred stockholders that which was due to them, and at the same time hold on to the stock of the new company which they had received because of their ownership of common stock in the defendant. It was in effect recognized, by those responsible for the merger, that the assets of the appellant were more than sufficient to pay the preferred stock in full, by reason of the circumstance that they allocated shares of the new company to the common stockholders of the defendant.

Were it to be held that market value is the only method by which to measure payment to preferred stockholders in the event of a merger, then preference shares would be a security with a false label, as it is manifest that those in control of a corporation can so manage its finances as to cause the market value of preferred stock to bear no relation to its value as measured by the assets of the corporation—could do this by the means pursued

PETRY *v.* HARWOOD ELECTRIC CO., Appel. (No. 1). 157

1924.]                    Opinion of the Court.

here of refusing to pay dividends on the preferred stock, and by putting the earnings of the company, which should go to the preferred stockholders (voiceless in this and in many instances in management), back into the property to increase the value of the common stock. If market value were the sole test, then preferred stockholders, without a vote, would be helpless and at the mercy of those controlling the common stock. As the chancellor states: "The majority of the common stock of the Harwood Electric Company was in the hands of a single owner, which gave the power to select the directors, and to dictate the policy to be pursued, while the preferred stockholders had no vote."

Our conclusion is, that the merger worked a dissolution, so far as the preferred stockholders are concerned, and they, therefore, are entitled to receive payment according to the terms of their contract out of the assets of the defendant. After consideration of defendant's balance sheets, its earnings, the estimates of the value of its property as made by its manager and all the other witnesses, the diversion of earnings for the amortization of the over-valued securities, that dividends should have been paid, and the fact that the owners of the common stock received for their shares stock of the new company which should have gone to the plaintiffs as holders of preferred shares if it were true that the assets of the defendant were not sufficient to pay the preferred stock at par, we think the case was properly adjudged in the court below.

Regarding the questions raised by appellant as to the admissibility of reproduction costs and opinions of value of complainant's witnesses, our conclusion is that they were admissible.

As to the assignment of error relating to the payment of costs, considering the way defendant acted toward its preferred stockholders, it should pay them.

The decree is affirmed at appellant's costs.