**The HITCHCOCK CORPORATION,**
**Plaintiff,**

v.

**T. L. TOWNSEND, Acting Director of**
**Internal Revenue, Defendant.**

Civ. No. 847–G.

United States District Court
M. D. North Carolina,
Greensboro Division.

July 15, 1955.

Harkins, Van Winkle, Walton & Buck,
Frank M. Parker, Asheville, N. C., for
plaintiff.

Edwin M. Stanley, U. S. Atty., Greensboro, N. C., H. Brian Holland, Asst.
Atty. Gen., for defendant.

HAYES, District Judge.

This case involves the interpretation
of 26 U.S.C.A. § 23(m) and 26 U.S.C.A.
§ 114(b) (4) (A) and (B) (i–iv).[1]

The controversy here arises over the
determination of the gross income of
plaintiff from which 15% depletion is
to be deducted.  Plaintiff computed its
gross income from its gross sales of pul-

---

1. "§ 23.  Deductions from gross income
   "In computing net income there shall
   be allowed as deductions:

   \*      \*      \*      \*      \*

   "(m) *Depletion.*  In the case of mines,
   oil and gas wells, other natural deposits,
   and timber, a reasonable allowance for
   depletion and for depreciation of improvements, according to the peculiar conditions in each case;  such reasonable allowance in all cases to be made under
   rules and regulations to be prescribed
   by the Commissioner, with the approval

   of the Secretary. \* \* \*"  26 U.S.C.A.
   § 23.

   "§ 114.  Basis for depreciation and depletion

   \*      \*      \*      \*      \*      \*

   "(b) *Basis for depletion*

   \*      \*      \*      \*      \*      \*

   "(4) [As amended by Section 15(b),
   Act of August 8, 1947, c. 515, 61 Stat.
   917] *Percentage depletion for coal, bauxite, fluorspar, flake graphite, vermiculite,
   beryl, feldspar, mica, talc (including pyrophyllite), lepidolite, spodumene, barite,*

verized talc and talc crayons; the Commissioner disallowed any costs after the talc was brought to the surface as a result of which plaintiff was compelled to pay additional taxes for 1948 of $16,-343.63 with interest amounting to $4,-254.54, which was paid July 20, 1953.

The evidence shows beyond controversy that plaintiff blasts the talc in a mine and hoists it in buckets some 250 to 300 feet to the mine outlet. Here it is divided according to quality, and that which is of a sufficient firmness is conveyed to the crayon mill where it is sawn into blocks 4″ to 6″, then cut into small squares and then rounded into crayon pencils about ⅓ of an inch in diameter and 4″ to 6″ in length, crated in cartons and baled for shipment. The remnants and scraps are then transferred to the other talc for pulverization in the crusher. The plaintiff sells pulverized talc powder and talc crayons. Its mined product is not marketable until it becomes powder or crayon pencils. The act defines "gross income from the property" to be the gross income from

mining and then amplifies the meaning of mining as follows: "The term 'mining', as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." Under sub-heads (I), (II), (III) and (IV) it specifies certain acts which shall be included in the term "ordinary treatment processes" but does not exclude any other ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products.

It seems perfectly clear that Congress included in "mining" the expense necessary to complete the product into a marketable product, If, therefore, the talc had been marketable in the lumps as it is brought to the surface from the mine, the expense of subsequent treatment could not be included as a mining expense.

*ball, sagger, and china clay, rock asphalt, phosphate rock, trona, bentonite, gilsonite, thenardite, and metal mines, potash, and sulfur.—*

"(A) *In general.* The allowance for depletion under section 23(m) shall be, in the case of * * * talc (including pyrophyllite), * * * 15 per centum, * * * excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property.

"(B) [As added by Section 124(c), Revenue Act of 1943, c. 63, 58 Stat. 21] *Definition of gross income from property.* As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining', as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term 'ordinary treatment processes', as used herein, shall include the following: (i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; (ii) in the

case of sulphur—pumping to vats, cooling, breaking, and loading for shipment; (iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and benefication by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, percipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores. The principles of this subparagraph shall also be applicable in determining gross income attributable to mining for the purposes of sections 731 and 735." 26 U.S.C.A. § 114.

■ The defendant doubts if pulverizing talc blocks is a treatment process but in any event it insists that making talc pencils is a pure manufacturing process and should never be included as a mining expense. Both these contentions are untenable because the broad language of the Act clearly states that mining shall include "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." The processes of the taxpayer were those normally applied by mine operators to obtain commercially marketable products. Since the plaintiff's products were not marketable except as crayons or powder the steps necessary to produce these marketable products come within the meaning of mining under the Act and the gross income from the sale of powder and crayons should be the basis for arriving at the 15% depletion deduction.

This interpretation is supported by United States v. Cherokee Brick & Tile Co., 5 Cir., 218 F.2d 424; International Talc Co. v. Commissioner, 15 T.C. 981 and Riley v. Douglass, 9 Cir., 221 F.2d 146.

■ The defendant also contends that the bags for powder and cartons for crayon should not be included in the gross sales. The evidence is not contradicted that the powder is marketable only in 50 lb. bags and the crayons when placed in cartons and crated for shipment F.O.B. Murphy, N.C. The purchaser buys powder and crayons; the containers are incidental but essential for the marketing of the mineral product. They are necessary expenses for marketing the products, and the gross sales should not be diminished on account of their cost.

■ In the view we have expressed, it becomes unnecessary to dwell on the specific acts enumerated under subsections (I), (II), (III) and (IV), nor to elaborate on whether the acts of plaintiff in obtaining talc powder and talc crayon are within the orb of manufacturing or of treatment, Congress clearly provided that the cost of obtaining a marketable product should come within the definition of mining and the same basis should be applied to gross sales. The only limitation by Congress is that the process must be that normally applied by the miner to obtain a marketable product. It seems immaterial whether that process be one of manufacture as in the brick and tile case, supra, or some other step; that which was essential to obtain the first marketable product is an expense of mining and the gross sales of the products so mined is the gross income from which the 15% depletion is to be taken.

Judgment accordingly will be entered for the plaintiff.